# EXHIBIT A

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

FORM 10-KSB

(Mark one)

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (fee required)

FOR THE FISCAL YEAR ENDED JUNE 30, 2006

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from __________ to __________

Commission File No. 0-15113

VERITEC, INC.
(Exact name of small business issuer in its charter)

| | |
|---|---|
| Nevada<br>(State or Other Jurisdiction of Incorporation or Organization) | 95-3954373<br>(IRS Employer Identification No.) |
| 2445 Winnetka Avenue No. Golden Valley, MN<br>(Address of principal executive offices) | 55427<br>(Zip Code) |

Issuer's telephone number, including area code: 763-253-2670

Securities registered under Section 12(b) of the Act: None

Securities registered under Section 12(g) of the Act: Common stock, $.01 par value
(Title of Class)

Check whether the issuer: (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [ ] No [X].

Check if there is no disclosure of delinquent filers in response to Item 405 of Regulation S-B contained in this form, and no disclosure will be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-KSB or any amendment to the Form 10-KSB. [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes [ ] No [X].

Revenues for the year ended June 30, 2006 were $2,362,484.

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Company, computed by reference to the average bid price of the common stock on June 30, 2005, was approximately $8,579,048.

Number of shares outstanding as of June 30, 2006 was: 15,078,598.

Check whether the issuer has filed all documents and reports required to be filed by Section 12, 13, or 15(d) of the Exchange Act after the distribution of securities under a plan confirmed by a court. Yes [ ] No [X].

DOCUMENTS INCORPORATED BY REFERENCE

Form 10-KSB for the period ended June 30, 1999 is hereby incorporated by reference.

THIS DOCUMENT CONSISTS OF 48 PAGES, INCLUDING THE EXHIBIT PAGES.
THE EXHIBIT INDEX IS ON PAGE 44.

VERITEC, INC.

FORM 10-KSB
FOR THE FISCAL YEAR ENDED JUNE 30, 2006

TABLE OF CONTENTS


| | | Page No. |
|---|---|---|
| PART I | | 4 |
| | FORWARD - LOOKING STATEMENTS | 4 |
| ITEM 1 | DESCRIPTION OF BUSINESS | 4 |
| ITEM 1A | RISK FACTORS | 10 |
| ITEM 2 | DESCRIPTION OF PROPERTY | 12 |
| ITEM 3 | LEGAL PROCEEDINGS | 12 |
| ITEM 4 | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 15 |
| PART II | | 15 |
| ITEM 5 | MARKET FOR COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND SMALL BUSINESS ISSUER PURCHASES OF EQUITY SECURITIES | 15 |
| ITEM 6 | MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION | 16 |
| ITEM 7 | FINANCIAL STATEMENTS | 19 |
| ITEM 8 | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURES | 39 |
| ITEM 8A | CONTROLS AND PROCEDURES | 39 |
| ITEM 8B | OTHER INFORMATION | 39 |
| PART III | | 40 |
| ITEM 9 | DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS AND CORPORATE GOVERNANCE; COMPLIANCE WITH SECTION 16 (a) OF THE EXCHANGE ACT | 40 |
| ITEM 10 | EXECUTIVE COMPENSATION | 41 |
| ITEM 11 | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 41 |
| ITEM 12 | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 42 |
| ITEM 13 | EXHIBITS | 44 |
| ITEM 14 | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 45 |
| SIGNATURES | | 45 |

# PART I

## FORWARD-LOOKING STATEMENTS

This Form 10-KSB contains various "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements represent expectations and beliefs concerning a company's outlook, future economic events, future performance and attainment of future goals and are based on information available on the date of the filing, and are subject to various risks and uncertainties.

The Private Securities Litigation Reform Act of 1995 provides "safe harbor" for forward-looking statements. Certain information included in this Form 10-KSB and other materials filed or to be filed with the Securities and Exchange Commission (as well as information included in oral statements or other written statements made or to be made) contain statements that are forward-looking and actual results may materially differ from any future results expressed or implied by such forward-looking statements. In addition to statements that explicitly describe such risks and uncertainties readers are urged to consider statements using the terms "anticipates" "belief", "believes", "can", "intends", "may", "plans", "shall", or "will", and similar expressions to be uncertain and forward-looking. Such forward-looking statements involve important risks and uncertainties that could significantly affect anticipated results in the future and accordingly, such results may materially differ from those expressed as our desired outcome, goal, or result.

We undertake no obligation to update any forward-looking statements to reflect events or circumstances that may arise after the date hereof unless specifically required by the filing requirements of the Securities and Exchange Act as amended or, the Regulations promulgated thereunder.

## ITEM 1 DESCRIPTION OF BUSINESS

### (a) General Development of Business

The Company refers to Veritec, Inc. (Veritec) and its wholly owned subsidiaries, Veritec Iconix Ventures, Inc. (VIVI-Japan; a Japanese company, discontinued April 2005) and VCode Holdings, Inc. (VCode).

Veritec was incorporated in the State of Nevada on September 8, 1982 for the purpose of development, marketing and sales of a line of microprocessor based encoding and decoding system products that utilize Matrix Symbology technology, a two-dimensional barcode technology originally invented by the founders of Veritec under United States patents 4,924,078, 5,331,176 and 5,612,524. As more fully described below, these patents are the property of VCode.

In 1995, an involuntary proceeding under Chapter 7 of the United States Bankruptcy Code was commenced against us. The proceeding was subsequently converted to a Chapter 11 proceeding and a plan of reorganization was confirmed on April 23, 1997. The plan was completed, the trustee was discharged, and the case closed on October 13, 1999. Further information with respect to the bankruptcy proceeding is set forth in Item 3 of the Annual Report on Form 10-KSB filed by us for the year ended June 30, 1999, which report is incorporated herein by reference.

In 1999, we moved from our previous location in California to a suburb of Minneapolis, Minnesota. After moving to Minnesota, engineering efforts were focused on converting the DOS based operating system to both Windows and UNIX operating platforms, further augmenting the number of computers with which our technology works.

In January 2002, Veritec initiated arbitration in the International Court of Arbitration of the International Chamber of Commerce in Los Angeles, California, against Mitsubishi Corporation (Mitsubishi), alleging five causes of action arising out of various contracts and business dealings. Mitsubishi counterclaimed and arbitration commenced.

In February 2002, as part of our objective to increase sales in Asia, we acquired 50% ownership of Veritec Iconix Ventures, Inc. (VIVI-USA). The other 50% of VIVI-USA was acquired by The Matthews Group, a related party. In April 2002, VIVI-USA acquired VIVI-Japan. In June 2003, we acquired The Matthews Group's 50% interest in VIVI-USA bringing our ownership of VIVI-USA and VIVI-Japan to 100%.

In June 2003, we sold VIVI-Japan's textile customer to Com Techno Alpha Inc. (Com Techno), a Japanese corporation, for:

- 8,100,000 yen to be paid at a rate of 225,000 yen per month for thirty-six months ($67,782 and $1,883 respectively in U.S. dollars).
- 120,000 shares of Veritec's common stock (subsequently returned and cancelled).

Yoshihiro Tasaka, the principal of Com Techno, is a former employee and officer of VIVI-Japan. The agreement provided for acceleration of payments to be received for each sale of a Tuft Controller by Com Techno to this customer.

In November 2003, Veritec formed VCode to which it assigned United States patents 4,924,078, 5,331,176 and 5,612,524, together with all corresponding patent applications, foreign patents, foreign patent applications, and all continuations, continuations in part, divisions, extensions, renewals, reissues and re-examinations. VCode in turn entered into an Exclusive License Agreement with VData, LLC (VData), an Illinois limited liability company unrelated to Veritec. The purpose of the Exclusive Licensing Agreement is to allow VData to pursue enforcement and licensing of the patents against parties who wrongfully exploit the technology of such patents. VData is the wholly owned subsidiary of Acacia Research Corporation (NASDAQ: ACTG) (collectively Acacia). The Exclusive License Agreement provides that all expenses related to the enforcement and licensing of the patents will be the responsibility of VData, with the parties sharing in the net proceeds, as specified under the terms of the agreement, arising from enforcement or licensing of the patents.

In January 2004, the Mitsubishi arbitration continued with Veritec proceeding on two claims against Mitsubishi (tortuous interference with prospective business opportunities and termination of a licensing agreement); and, Mitsubishi proceeded on various claims against Veritec for trade secret misappropriation and copyright infringement based upon the Error Detection and Correction Technology functionality utilized by Veritec, together with, assorted breach of contract claims. After three days the hearing was suspended because of procedural irregularities.

In May 2004, VIVI-USA was dissolved and VIVI-USA's investment in VIVI-Japan was transferred to Veritec.

In February 2005, an adverse ruling was made against Veritec and in favor of Mitsubishi resulting in a monetary award of $8,174,518 to Mitsubishi and enjoining Veritec and by extension Veritec's customers from the future use or sale of what was ruled as Mitsubishi's Error Detection and Correction Technology. This ruling compelled Veritec to file a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court (Bankruptcy Court) for the District of Minnesota on February 28, 2005.

In April 2005, the Company discontinued the VIVI-Japan operations due to continuing losses and the Company's financial condition. Mr. Masayuki Kuriyama, the former operations manager of VIVI-Japan, was assigned the right to utilize the VIVI-Japan name without liability to Veritec.

In December 2005, the Bankruptcy Court converted the Chapter 11 proceeding to Chapter 7 of the Bankruptcy Code. Under Chapter 7, Veritec would be liquidated and the shareholders would not receive anything upon liquidation.

Veritec's Third Amended Plan of Reorganization, with proof of acceptability of its provisions by Mitsubishi and the majority of the other classes of creditors, was submitted to the Bankruptcy Court with a motion requesting reconversion of Veritec's case in bankruptcy to Chapter 11. This motion and related order was approved in March 2006. On March 13, 2006, the order was executed subject only to approval of the majority of creditors and shareholders of record, which was subsequently obtained.

Upon execution of the order, Veritec once again became a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court. In general, as a debtor-in-possession, Veritec was authorized under Chapter 11 to continue to operate as an ongoing business, but could not engage in transactions outside the ordinary course of business without the prior approval of the Bankruptcy Court.

In April 2006, Veritec's Third Amended Plan of Reorganization was confirmed by the Bankruptcy Court. On August 8, 2006, after resolution of disputed creditor claims, Veritec received from the Bankruptcy Court an Order and Final Decree closing the Chapter 11 case in its entirety. As reflected in the Consolidated Financial Statements appearing in this Form 10-KSB, Veritec was relieved of $9,356,948 in debt including $7,874,518 owed to Mitsubishi.

In October 2006, Veritec entered into an agreement to purchase selected assets of Secure Environments, Inc. (SEI), a Minnesota corporation that produces identification cards. The assets acquired consisted of office furniture, computer equipment, specialty software, security card and badge printers, and a customer base of 73 small to large commercial and municipal customers, including security firms and police departments. Terms of the purchase were Veritec's assumption of $3,900 in debt and a 10% royalty, not to exceed $150,000 in aggregate, for any future sales by Veritec to the 73 SEI customers. No other consideration was, or is, to be paid.

(b) Nature of Business

The Company is primarily engaged in the development, marketing, and sales of a line of microprocessor based encoding and decoding systems that utilize Matrix Symbology technology, a two-dimensional barcode technology originally invented by the founders of Veritec under United States patents 4,924,078, 5,331,176 and 5,612,524. The Company's encoding and decoding systems allow a manufacturer, distributor, reseller or user of products, to create and apply unique identifiers to the products in the form of a coded symbol. The coded symbol containing the binary encoded data applied to the product enable automated manufacturing control, together with identification, tracking, and collection of data through cameras, readers and scanners also marketed by the Company. The collected data is then available for contemporaneous verification or other user definable purposes. Veritec has also developed a Secured

Identification System based upon its proprietary VSCode and VeriCode(R) Symbology. The Company's Secured Identification System enables the storage of images, biometric information and data for contemporaneous verification of an individual's unique identity. In addition to its United States patents, the Company holds patents in Europe (German Patent No. 69033621.7; French Patent No. 0438841; and Great Britain Patent No. 0438841); and has applications pending with the United States Patent and Trademark Office for novel uses of its Multi-Dimensional Matrix Symbology.

The Company also seeks fees from the enforcement and licensing of it patents under its Exclusive License Agreement with Acacia. These fees have been a primary source of revenue for the Company.

The Company's main products are as follows:

The VeriCode(R)

The VeriCode(R) symbol is a two-dimensional high data density machine-readable symbol that can contain up to approximately 500 bytes of data in a small area. The VeriCode(R) symbol is based on a matrix pattern. The matrix is made up of data cells, which are light and dark contrasting squares. This part of the symbol looks like a scrambled chessboard. The matrix is enclosed within at least two solid lines and/or a solid border. Surrounding the solid border is a quiet zone of empty cells. This simple structure is the basis for the symbol's space efficiency.

The size of the VeriCode(R) symbol is variable and can be increased or decreased depending on application requirements. The symbol can be configured to fit virtually any space. The data capacity of the symbol is also variable. By using a greater or smaller number of data cells, more or less information can be stored in the symbol. The main limitation to the size and density of the VeriCode(R) symbol is the resolution of the marking and reading devices utilized by the user.

Special orientation for reading the symbol is not necessary and is the basis of the novelty of the Company's 5,612,524 patent. The VeriCode(R) symbol can be read at high degrees of angularity from vertical, in any direction relative to the reader. Veritec's symbology and reading software presently employs "Error Detection and Correction" (EDAC) technology of our own design, similar to that on music CD's. That means that if a symbol is partially damaged or obscured, the complete data set stored in the symbol might be recovered. EDAC lowers the symbol's data capacity, but it can permit data recovery if up to 25% of the symbol is damaged. With EDAC, the code will return either accurate information or no information, but it will not return false or wrong information.

The VeriCode(R) symbol offers high degrees of security and the level of this security can be specified depending on the user's requirements. For any specific application or organization, a unique encryption algorithm can be created so that only authorized persons can create or read a VeriCode(R) symbol within the user's application.

The VeriCode(R) symbol can hold any form of binary information that can be digitized including numbers, letters, images and the minutia for biometric information to the extent of its data storage capacity.

The VSCode

The VSCode is a derivative of the two-dimensional VeriCode(R) symbol. It is built around the core competencies of the VeriCode(R) symbol which includes the solid border, omni-directional reading and Error Detection and Correction capability. The distinguishing factor for the VSCode is its ability to encrypt a greater amount of data by increasing data density. This matrix can hold up to approximately 4,151 bytes of data making it ideal for holding identification and biometric information. The VSCode offers a high degree of security, which can also be defined by the application requirements of the user.

The VSCode symbol can hold any form of binary information that can be digitized, including numbers, letters, images, photos, graphics, the minutia for biometric information, including fingerprints, to the extent of its data storage capacity, that are likewise limited by the resolution of the marking and reading devices employed by the user.

VSCode is designed for bankcards and high security applications. Because the code is encrypted on the card it can be an independent portable database containing non-duplicative information that is unique to the individual owner of the bank account or credit card; or, the data can be verified through a central database while maintaining high security for the card issuer without the need of a PIN.

The FCR-100 Fingerprint Card Reader

The FCR-100 is a compact fingerprint card reader used to read and decode the VSCode symbology containing biometric information and other secured data. It consists of a combination of several modular components, including a quality camera, lighting mechanism, digital fingerprint reader, software lock, USB cable and housing, all tied into a PC operating system running the proprietary Veritec software. Due to its modular design, the FCR-100 can be modified to meet specific application needs.

The FCR-100 can be designed to work on most PC based operating systems, including the full suite of Windows(R) operating systems. This allows the operating system to function with the many different types of VSCode applications such as bankcards, access control, personnel identification, border control, and hospital identification cards. The FCR-100 is connected and powered by a USB cable connection to a PC or server. The FCR-100 can be utilized with wireless applications and will allow multiple reading stations to be connected to a single computer.

Patents

United States Patent No. 4,924,078 was issued on May 8, 1990 on our founders' application filed November 25, 1987. United States Patent No. 5,612,524 is a continuation of the 4,924,078 patent. U.S. Patent No. 5,331,176 was issued on July 19, 1994 on our founders' application filed on April 10, 1992. Veritec has filed for additional U.S. patents related to novel uses of the Matrix Symbologies. The Company holds the following European Patents: Germany Patent No. 69033621.7; French and Great Britain Patent No. 0438841.

Trademarks

We have filed applications to register the trademark "VeriSecure" in the United States. We have also filed applications to trademark "VSCode" in the following countries: Australia, Taiwan, South Korea, Singapore, Japan, China, and Vietnam. In addition we have filed applications to register VeriCode(R) in the following countries: China, Singapore, Vietnam, and Australia. We have registered trademarks for VeriCode(R) in the United States, Taiwan and South Korea. The Company uses the following trademarks VeriWrite(C), VeriRead(C), VSWrite(C) and VSRead(C).

Seasonality

We have not historically experienced seasonality.

### Major Customers

During the fiscal year ended June 30, 2006, two foreign customers accounted for 41% of our revenues and three customers accounted for 74% of our revenues. Our largest customers have distribution facilities in Korea, Japan and Taiwan. During the fiscal year ended June 30, 2005, two foreign customers and two United States based customers accounted for 77% of our revenues.

### Engineering, Research and Development

As of June 30, 2006, Veritec employed two full-time engineers and two consultants in its engineering, research and development department. Despite the fact that we were trying to improve our products and to develop new ones, with the Company in bankruptcy we had to curtail these efforts. Since emerging from bankruptcy we now employ three full-time engineers and have resumed our research and development efforts.

### Competition

The "symbology" business is intensely competitive. The Company is presently under capitalized and recently emerged from bankruptcy. Consequently, there can be no assurance that the Company will be able to successfully compete in the "symbology" business.

Our VeriCode(R) and VSCode Matrix Symbologies compete with alternative machine-readable codes such as conventional bar code systems, including UPC, EAN Code 39 and Code 49; and alphanumeric systems such as OCR-A and OCR-B. Competitors offering alternative symbologies include numerous well capitalized publicly traded companies who offer a spectrum of bar code related systems including Symbol Technologies (NYSE: SBL); Zebra Technologies Corporation (NASDAQ: ZBRA); and Siemens Energy and Automation, Inc., a subsidiary of Siemens AG (NYSE: SI).

The "DataMatrix" two-dimensional bar code is an established competitor to the VeriCode(R). The DataMatrix code was popularized by Robotic Vision Systems, Inc., which declared the DataMatrix symbol to be "in the public domain." In contrast, our VeriCode(R) Symbol and technology are protected by various U.S. and European patents and our software source codes are proprietary and protected by copyright.

Veritec believes that while many potential customers and users of symbology prefer to use a system that is believed to be in the public domain with open source code software applications, we believe that other companies, especially those requiring high security encoding and decoding capability will prefer to purchase "closed" or proprietary systems. Our technology may be the technology of choice for these potential customers.

Moreover, because of the high data density of the Company's VSCode and its ability to provide error free reading in low contrast applications, we believe the other 2-Dimensional symbols are not capable of competing in these applications. However, new codes may be developed in the future that could.

### Environmental Compliance

We believe that we are in compliance with all current federal and state environmental laws.

### Employees

As of June 30, 2006, inclusive of the two full-time engineers and two contracted individuals employed by the Company in its engineering, research and development department as described above, the Company employs six full-time employees and one part-time employee compared to seven full-time employees and one part-time employees in 2005. In addition, the Company retained three consultants to provide specific services related to various projects and specific needs throughout the year. The Company continually evaluates the need for the hiring of qualified personnel.

### Financial Information about Geographic Areas

Foreign revenues accounted for 65% of the Company's revenue in fiscal year 2006 compared to 63% in fiscal year 2005. To date our revenues are concentrated in Japan, Korea and Taiwan.

### Available Information

The public may read and copy any materials Veritec has filed with the United States Bankruptcy Court for the District of Minnesota at Room 301 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, attention Ms. Lori Vosejpke, Bankruptcy Clerk (612) 664-5200.

The public may read and copy any materials we have filed with the Securities and Exchange Commission (SEC) at the SEC's Public Reference Room at 450 Fifth Street, N.W., Washington D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. We electronically file reports with the SEC. Filings may be found on the Internet site maintained by the SEC at www.SEC.gov; or, by accessing www.freeedgar.com; and other Internet based financial service providers. Other information about us can be found at our website, www.veritecinc.com and by contacting the Company at 2445 Winnetka Avenue North, Golden Valley, Minnesota 55427 (763) 253-2670.

## ITEM 1A RISK FACTORS

### Risk Factors

Investing in our Company entails substantial risk. In addition to the other risks and uncertainties discussed herein or available from outside sources, a number of risks and uncertainties that could cause actual results to differ materially from the plans, intentions and expectations reflected in or suggested by forward-looking statements of the Company set forth within the body and Exhibits hereof include amongst other things:

### General Factors

### We Have a History of Operating Losses

We have a history of operating losses that were a substantial factor in the Company having been twice placed in bankruptcy. Once from October 1995 through October 1999 and again from February 2005 through August 2006. To halt the continuation of these losses, we are developing new products, entering new markets and developing strategic alliances to grow revenue. There can be no assurance that we will be successful in these efforts, and even if we are, whether we can become profitable.

Loss of the Services of Key Employees Could Harm Our Operations

The Company's performance depends on the talents and efforts of our key management and technical employees. The loss of certain key individuals could diminish our ability to maintain relationships with current and potential customers or to meet development and implementation schedules for existing technology and the technology that the Company intends to introduce in the future. Our future success also depends on our continuing ability to identify, hire, train and retain highly qualified technical and managerial personnel. If we fail to attract or retain these key individuals in the future, our business could be disrupted.

Continuing Licensing Revenues from Acacia and Intellectual Property

The Company is dependent on Acacia for a significant portion of its revenue. In the event of an adverse determination either with regard to the Patent Reexaminations or the Declaratory Judgment being sought by Cognex, our future ability to obtain licensing fees for the 4,924,078 and 5,612,524 patents could cease. In addition to Cognex, future challenges of our intellectual property could be made by other claimants. Our business would be materially impacted in the event such claims are raised and ruled against us.

Competition in the Asian Market

The Company currently relies heavily on its sales to the Asian markets. The cross-licensing agreement we executed with Mitsubishi that allowed for our emergence from bankruptcy and rights to use of the Mitsubishi Error Detection and Correction Technology, gave Mitsubishi a license to our VeriCode(R) Technology that may result in increased competition. Competition in the Machine Readable Information and symbology sector, coupled with the strain on our relationships with our licensees and distributors while we were in bankruptcy may impact future sales.

Dependence on The Matthews Group

The Company has traditionally been dependent on The Matthews Group for its financial support. Management does not believe additional monies above the stock subscription obligation will be required in the immediate future. However additional capital may be required at some future point. The Company cannot guarantee going forward that The Matthews Group will continue to provide additional funding.

Ability to Obtain Access to Capital

Due to the Company's prior bankruptcies and history of losses, the Company's ability to raise funds, whether from lending, selling stock, or other sources, may be difficult to achieve. The Company may need to raise additional capital for the development or marketing of new products. If the Company can not raise such capital, or if the cost of such capital is too high, we may be unable to successfully develop and launch new products.

Effect of the Bankruptcy

The Company having been in bankruptcy has made it difficult for the Company to establish new trade credit relationships with both vendors and customers. Although the Company believes it will restore its credibility going forward, the lack of trade credit could substantially impair the Company's ability to grow and implement its plans.

Competition

Our VeriCode(R) and VSCode Matrix Symbologies compete with alternative machine-readable codes such as conventional bar code systems, including UPC, EAN Code 39 and Code 49; and, alphanumeric systems such as OCR-A, OCR-B, PDF-417, Data Matrix and many others. Competitors offering alternative symbologies include numerous well capitalized private and publicly traded companies who offer a wide variety of bar code systems and solutions, as well as, alternative product solutions such as Radio Frequency Identification (RFID) and Global Positioning Satellite (GPS) technology. Our competitors include but are not limited to: Intermec (NYSE: IN); Siemens Energy and Automation, Inc., a subsidiary of Siemens AG (NYSE: SI); Symbol Technologies (NYSE: SBL); and, Zebra Technologies Corporation (NASDAQ: ZBRA). These companies have more resources than the Company, already have a strong customer base, and their products are widely used in the market place. Competition from such companies may further reduce the future level of demand for the Company's products and/or the Company's future margins of profit.

General Conditions Beyond the Companies Control

The general economic condition of the United States and other regions of the world, work disruptions, labor negotiations both at the Company and with our licensees and distributors, actions of the U.S. and foreign governments, foreign currency exchange rate fluctuations, inflation and other economic events all to varying degrees do, could and would have an effect upon the Company some of which could be a material adverse impact.

ITEM 2 DESCRIPTION OF PROPERTIES

We lease approximately 3,200 square feet of office and laboratory space at 2445 Winnetka Avenue North, Golden Valley, Minnesota 55427, which serves as our primary place of business. This lease is with Van Thuy Tran, a director and chief executive officer of the Company. Our lease requires monthly payments of $3,150 and runs through June 30, 2007.

As of June 30, 2005, Veritec was leasing on a month-to-month basis, a single-family residence located at 10310 -39th Avenue North, Plymouth, Minnesota to house visitors and consultants versus the high cost of hotel lodging. Our lease requires a monthly payment of $1,500. The residence is owned by Larry Johanns, a principal of The Matthews Group.

ITEM 3 LEGAL PROCEEDINGS

During the 1995-1997 bankruptcy, the Company sought an investment group to assist in funding the $2,000,000 under the Plan of Reorganization approved by the Bankruptcy Court in 1997. In the intervening years, various investment groups attempted to help the Company fund this required investment. Partial funding received from these investment groups was settled through stock issuances by the Company. One of these former investment groups made claims totaling $166,697 against the Company, $90,980 in cash and $75,717 in stock (94,646 shares at $.80 per share), but has not pursued legal action relating to these claims. It is possible that other investment groups will assert claims against the Company regarding their efforts to secure funding on behalf of the Company. Management believes it has appropriately reflected the activity with these investment groups in the accompanying consolidated financial statements. Management further feels these claims were settled in the bankruptcy. Due to uncertainties, however, it is at least reasonably possible that claims will be asserted and/or pursued. The ultimate outcome of these claims, if asserted and/or pursued, cannot presently be determined.

On June 30, 2000, we were served as a defendant in the matter of Starosolsky vs. Veritec, Inc., et al., in the United States District Court for the Central District of California. This suit was brought by a shareholder and former director of the Company against Veritec and various individuals claiming that certain corporate actions were taken without proper authority of the Company's Board of Directors and/or contrary to the Plan of Reorganization the Company filed and completed under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court in the 1990's. The complaint seeks equitable relief to set aside the issuance of Series H preferred stock (now converted into common stock) issued to The Matthews Group that was authorized by the previous approved bankruptcy reorganization plan in 1999, to prevent The Matthews Group from voting its stock at any meetings of stockholders and to remove certain of the individual defendants as directors of the Company. In December 2000, this case was transferred to the United States District Court for the District of Minnesota. The case has lingered without prosecution. Consequently, management is not able to express an opinion on the likely outcome.

On January 10, 2002, Veritec initiated arbitration against Mitsubishi in Los Angeles, California, alleging breach of contract, trade secret misappropriation and interference with business opportunities; seeking several million dollars in compensatory damages, punitive damages, legal fees and accrued interest. Mitsubishi counterclaimed on similar grounds and sought to enjoin Veritec's use of the Error Detection and Correction Technology which Mitsubishi claimed as its sole and separate property. Evidentiary hearings were conducted from the later part of August through September 4, 2004. On February 15, 2005, Veritec received notice from the International Court of Arbitration that it awarded Mitsubishi a total of $8,174,518 in monetary damages and enjoined Veritec's use or sale of the Error Detection and Correction Technology it deemed to be the sole property of Mitsubishi. As a result, on February 28, 2005, Veritec filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota. On December 16, 2005, the Bankruptcy Court converted Veritec's Chapter 11 case in bankruptcy to a Chapter 7 and the Bankruptcy Court ordered all assets of the Company to be turned over to the control of the Trustee.

In February 2006, Veritec and Mitsubishi entered into a Settlement Agreement whereby, in exchange for $300,000, a license to utilize Veritec's VeriCode(R) Technology, and dismissal of the patent infringement litigation filed by VData and VCode against Mitsubishi, Mitsubishi waived its right to the $8,174,518 and granted Veritec a license to use the Mitsubishi Error Detection and Correction Technology. In light of the Settlement Agreement entered into with Mitsubishi, on March 8, 2006, the Bankruptcy Court ruled in favor of reconverting Veritec's case in bankruptcy back to one under Chapter 11 of the Bankruptcy Code. Veritec's Third Amended Plan of Reorganization was formally filed with the Court on March 13, 2006. In April 2006, Veritec's Third Amended Plan of Reorganization was confirmed by the Bankruptcy Court. On August 8, 2006, after resolution of disputed creditor claims, Veritec received from the Bankruptcy Court an Order and Final Decree Closing the Chapter 11 case in its entirety. As reflected in the Consolidated Financial Statements appearing in this Form 10-KSB, Veritec was relieved of $9,356,948 in debt including $7,874,518 owed to Mitsubishi.

VCode joined with VData as Plaintiffs in patent enforcement litigation filed on October 25, 2004, against Adidas America, Inc., Adidas Solomon AG, Advanced Micro Devices, Inc., Boston Scientific Corporation, Stamps.com, and Hitachi Global Storage Technologies (Thailand) Ltd. in the United States District Court for the District of Minnesota. Adidas America, Inc., Advanced Micro Devices, Inc., Boston Scientific, and Stamps.com filed Counterclaims in those actions. All Defendants have since settled and entered into licensing agreements for use of the technology under the Company's patents.

VCode joined with VData as Plaintiffs in patent enforcement litigation filed on September 8, 2005, against Mitsubishi Corporation in the United States District Court for the District of Minnesota alleging violations of the Company's patents. This matter was dismissed as a part of the Settlement Agreement with Mitsubishi described above.

VCode joined with VData as Plaintiffs in patent enforcement litigation filed on October 4, 2005, against Brother Industries, Ltd., Sato Corporation, Toshiba Corporation, and US Bank National Association in the United States District Court for the District of Minnesota alleging violations of the Company's patents. US Bank National Association has entered into a licensing agreement with the Company and the case as to that defendant was dismissed as well as the case against Sato Corporation. No opinion can be rendered at this time with respect to the outcome of this action as to the remaining defendants.

On January 26, 2006, Hartz Mountain Corporation, in response to a notice of infringement sent to it by VData, filed a preemptive action seeking a Declaratory Judgment against VData and the Company in the United States District Court for the District of New Jersey. Amongst other remedies the action sought a ruling from the Court that the Company's 4,924,078, 5,331,176 and 5,612,524 patents were not enforceable against Hartz Mountain and its related companies. The Company has been advised by legal counsel that the preemptive filing of a Declaratory Judgment action is commonplace in the enforcement areas of patent law and practice. The Company joined VData with the filing of a cross complaint against Hartz Mountain seeking amongst other remedies, monetary damages for past infringement and future use of the knowledge learned from the Company's patents. Hartz Mountain entered into a licensing agreement with VData and the Company whereupon Hartz Mountain dismissed its action for Declaratory Judgment and VData and the Company dismissed their actions against Hartz Mountain.

On March 13, 2006, in response to notices of infringement sent to their customers by VData, Cognex Corporation filed a preemptive action seeking a Declaratory Judgment against VData and the Company in the United States District Court for the District of Minnesota. Amongst other remedies the action seeks a ruling from the court that the Company's 5,612,524 patent is not enforceable against Cognex Corporation and its customers. Presently, the Company is conferring with VData and the legal counsel retained by VData to defend against this action. Due to the recent nature of the case, only jurisdictional and procedural issues have been litigated and a responsive pleading on behalf of VData and the Company has not yet been filed. The Company cannot render an opinion at this time with respect to the outcome of these actions.

On March 22, 2006, the United States Patent and Trademark Office granted an application made for an Ex Parte Reexamination of the Company's 5,612,524 patent. The Company is conferring with VData, and counsel retained by VData, to file the Company's reply to the applicant's submission. Due to the recent nature of this matter, a response on behalf of VCode has not been filed with the United States Patent and Trademark Office. The Company has been advised by legal counsel that a preemptive filing of such a request for Ex Parte Reexaminations is commonplace in the enforcement areas of patent law and practice. The Company is confident in its patent but cannot render an opinion at this time with respect to the outcome of the reexamination. However, not all claims of the patent have been challenged and the Company believes that a determination adverse to the patent would not be detrimental to the Company's ability to market its products, but could be detrimental to collection of licensing fees based upon this patent.

On May 23, 2006, VCode joined with VData as a Plaintiff in a pending patent enforcement litigation filed against Aetna, Inc., PNY Technologies, Inc., Merchants' Credit Guide Co., The Allstate Corporation and American Heritage Life Insurance Company in the United States District Court for the District of Minnesota alleging violations of the Company's patents. The Allstate Corporation and American Heritage Life Insurance Company have entered into a licensing agreement with the Company and the case as to those defendants has been dismissed. Aetna, Inc., and Merchants' Credit Guide Co., have filed responsive pleadings in the action. No opinion can be rendered at this time with respect to the outcome of this action as to the remaining defendants.

On September 5, 2006, an application was made for an Ex Parte Reexamination of the Company's 4,924,078 patent. The Company is awaiting a determination from the United States Patent and Trademark Office if it will grant reexamination on the Application. The Company has conferred with VData, and the legal counsel retained by VData, to file the Company's reply to the applicant's submission should it be granted. Due to the recent nature of this matter, a response on behalf of VCode is not yet required. The Company is confident in its patent but cannot render an opinion at this time with respect to the outcome of the reexamination. However, the Company believes that a determination adverse to the patent would not be detrimental to the Company's ability to market its products, but could be detrimental to collection of licensing fees based upon this patent.

SEC Reporting Obligations

We are subject to the continuing reporting obligations of the Securities Exchange Act of 1934 (the 1934 Act), which, among other things, requires the filing of quarterly and annual reports and proxy materials with the Securities and Exchange Commission (the SEC). Prior to September 1999 and periodically thereafter, we did not comply with filing requirements. To our knowledge, there is no current inquiry or investigation pending or threatened by the SEC in connection with our prior reporting violations. However, there can be no assurance that we will not be subject to such inquiry or investigation in the future. As a result of any potential or pending inquiry by the SEC or other regulatory agency, we may be subject to penalties, including among other things, suspension of trading in our securities, court actions, administrative proceedings, preclusion from using certain registration forms under the 1933 Act, injunctive relief to prevent future violations, and/or criminal prosecution.

## ITEM 4 SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters where submitted to a vote of security holders through solicitation of proxies or otherwise during the fourth quarter. An annual report will not be issued to our shareholders for the period ended June 30, 2006.

# PART II

## ITEM 5 MARKET COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND SMALL BUSINESS ISSUER PURCHASES OF EQUITY SECURITIES

Market Information

Our common stock is traded in the over-the-counter market. Quotations are available on the OTC Pink Sheets. The common shares are not traded or quoted on any automated quotation system. The OTC Pink Sheet Symbol for our common stock is "VRTC.PK". The following table sets forth the range of high and low bid quotes of our common stock per quarter as provided by the National Quotation Bureau (which reflect inter-dealer prices without retail mark-up, mark-down or commission and may not necessarily represent actual transactions).

| Market Price Range of Common Stock | Fiscal 2006 | | Fiscal 2006 | |
|---|---|---|---|---|
| | High | Low | High | Low |
| Quarter Ended | | | | |
| September 30 | .52 | .12 | .90 | .25 |
| December 31 | .63 | .13 | 1.90 | .33 |
| March 31 | .65 | .17 | 2.95 | .14 |
| June 30 | 2.95 | .47 | .75 | .32 |

Shareholders

As of September 30, 2006, there were approximately 803 shareholders of record, inclusive of those brokerage firms and/or clearinghouses holding our common shares for their clientele (with each such brokerage house and clearing house being considered as one holder).

Dividend Information

We have not paid or declared any dividends upon our common stock since our inception and, by reason of our present financial status and our contemplated financial requirements, we do not anticipate paying any dividends in the foreseeable future.

Current Sales of Unregistered Securities

None

ITEM 6 MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION

Results of Continuing Operations - June 30, 2006 compared to June 30, 2005

We had net income from continuing operations of $10,112,971 in the fiscal year ended June 30, 2006 compared to a net loss from continuing operations of $9,092,625 in the fiscal year ended June 30, 2005. Income generated in 2006 was mostly related to debt relieved totaling $9,356,948.

Results of Discontinued Operations - June 30, 2006 compared to June 30, 2005

We had a net loss from discontinued operations of $306,688 in the fiscal year ended June 30, 2005. The 2005 loss was due to a decline in revenue of $210,300 for fiscal 2005, a decrease in gross profit percent to 26.2% in fiscal 2005, and disposal costs.

Revenues

Revenues from continuing operations increased from $1,617,498 for fiscal year ended June 30, 2005 to $2,362,484 for fiscal year ended June 30, 2006 or 46%. The increase in revenues was due in part, from the conversion from Chapter 7 to Chapter 11 of the Bankruptcy Code in March 2006. While in Chapter 7 of the Bankruptcy Code, the Company was not allowed to sell its products; upon conversion to Chapter 11 there was a backlog of orders that were filled. The increase was also attributed to the licensing fee revenue from Acacia of $769,267 in 2006 compared to $57,280 in 2005.

Operating Expenses

Operating expense of $1,585,178 for fiscal year ended June 30, 2006 was $9,046,083 or 85% lower than operating expense of $10,631,261 for fiscal year ended June 30, 2005. The Mitsubishi award of $8,174,518 accounts for 77% of the operating expenses in fiscal year ended June 30, 2005. The decrease was from reduced legal costs due to the Mitsubishi litigation process having concluded and an overall reduction of expenses from cost cutting efforts.

Other Income (Expense)

As a result of the closing of the Chapter 11 bankruptcy on August 8, 2006, the Company recorded income of $9,356,948 ($0.62 per common share, basic and diluted) from the relief of debt including $7,874,518 owed to Mitsubishi for the fiscal year ended June 30, 2006.

Interest expense for the fiscal year ended June 30, 2005 was $60,035. There was no interest expense in fiscal year ended June 30, 2006, as no debt was outstanding.

Capital Expenditures and Commitments

During the fiscal year ended June 30, 2006, we incurred capital purchases of $6,002 compared to $23,693 in 2005. Although we continue to minimize spending for capital expenditures, we believe our need for additional capital equipment will continue because of the need to develop and expand our business. The amount of such additional capital is uncertain and may be beyond that generated from operations.

Liquidity

The Company has relied on The Matthews Group for funding. Through November, 2006, The Matthews Group has funded $1,666,082, including prepayments, of the original of $2,000,000 stock subscription receivable.

In February 2005, Veritec filed for bankruptcy protection under Chapter 11 and in August 2006 emerged from bankruptcy. As reflected in the Consolidated Financial Statements appearing in this Form 10-KSB, Veritec was relieved of $9,356,948 in debt including $7,874,518 owed to Mitsubishi.

As of June 30, 2006 and 2005, the Company has recognized licensing revenue of $769,267 and $57,280, respectively, through its relationship with Acacia. The Company has received additional licensing revenue from Acacia of $ $644,783 in fiscal year 2007.

As of November 13, 2006, the Company had consolidated cash balances of $1,038,381, which, we believe is sufficient to meet our short-term needs. However, the Company may need additional capital to continue to develop and expand.

Commitments and Contractual Obligations

The Company has an annual lease commitment of $37,800 that expires June 30, 2007.

Off-Balance Sheet Arrangements

We do not have any off-balance sheet arrangements.

Critical Accounting Policies

Stock-Based Compensation:

The Company followed the accounting guidance of Accounting Principles Board (APB) Opinion No. 25, "Accounting for Stock Issued to Employees", for measurement and recognition of stock-based transactions with employees. No compensation cost was recognized for options issued under the plans when the exercise price of the options was at least equal to the fair market value of the common stock at the date of grant. Had compensation cost for the stock options issued been determined based on the fair value at the grant date, consistent with the provisions of Statement of Financial Accounting Standards (SFAS) No. 123, "Accounting for Stock-Based Compensation", the effect on the Company's 2005 net loss and loss per common share would have been insignificant.

The Financial Accounting Standards Board issued SFAS No. 123(R), "Share-Based Payment", in December 2004, which requires the cost of employee compensation paid with equity instruments to be measured based on grant-date fair values and recognized over the vesting period. The new rule allowed companies to implement SFAS No. 123(R) at the beginning of their fiscal year that begins after June 15, 2005. Under the new rule, SFAS No. 123(R) became effective for the Company on July 1, 2005. Adoption of SFAS No. 123(R) had no impact on the Company's consolidated financial statements as all options were fully-vested at the adoption date.

Accounting for Discontinued Operations:

Under the provisions of SFAS No. 144 "Accounting for the impairment or Disposal of Long-Lived Assets (as amended), if a component of an entity is either classified as held-for-sale or has been disposed of during the period, the results of its operations are to be reported in discontinued operations, provided that both of the following conditions are met:

a. The operations and cash flows of the component have been or will be removed from the ongoing operations of the entity as a result of the disposal transaction, and

b. The entity will have no significant continuing involvement in the operations of the component after the disposal transaction.

The Company liquidated its VIVI-Japan operations in April 2005. Management believes that the conditions for reporting VIVI-Japan as a discontinued operation under the above requirements of SFAS No. 144 were appropriate.

Revenue Recognition:

The Company accounts for revenue recognition in accordance with SEC Staff Accounting Bulletin (SAB) No. 101 "Revenue Recognition in Financial Statements" and related amendments. Revenues from software sales, product sales and engineering are recognized when products are shipped or services performed. License fees are recognized upon completion of all required terms under the agreement. The process typically begins with a customer purchase order detailing its hardware specifications so the Company can customize its software to the customer's hardware. Once customization is completed, the Company typically transmits the software to the customer via the Internet. Revenue is recognized at that point. Once the software is transmitted, the customers do not have a right of refusal or return. Under some agreements the customers remit payment prior to the Company having completed customization or completion of any other required services. In these instances, the Company delays revenue recognition and reflects the prepayments as customer deposits.

ITEM 7 FINANCIAL STATEMENTS

VERITEC, INC. AND SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS
YEARS ENDED JUNE 30, 2006 AND 2005

TABLE OF CONTENTS


| | Page |
|---|---|
| REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM.................. | 20 |
| CONSOLIDATED BALANCE SHEETS........................................... | 21 |
| CONSOLIDATED STATEMENTS OF OPERATIONS................................. | 22 |
| CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)................ | 23 |
| CONSOLIDATED STATEMENTS OF CASH FLOWS................................. | 24 |
| NOTES TO CONSOLIDATED FINANCIAL STATEMENTS............................. | 25 |

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Veritec, Inc.
Golden Valley, Minnesota

We have audited the accompanying consolidated balance sheets of Veritec, Inc. and Subsidiaries (Company) as of June 30, 2006 and 2005, and the related consolidated statements of operations, stockholders' equity (deficit) and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Veritec, Inc. and Subsidiaries as of June 30, 2006 and 2005, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

The Company filed for bankruptcy protection on February 28, 2005, and emerged from bankruptcy on August 8, 2006 (Note 1). The Company is involved in various litigation matters, which could have a significant effect on the Company (Note 11).

/s/ Lurie Besikof Lapidus & Company, LLP
---------------------------------------
Lurie Besikof Lapidus & Company, LLP
Minneapolis, Minnesota

November 13, 2006

VERITEC, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS
JUNE 30, 2006 AND 2005

| | 2006 | 2005 |
|---|---|---|
| ASSETS | | |
| Current Assets: | | |
| Cash | $ 898,424 | $ 432,518 |
| Accounts receivables, net of allowance of $28,000 and $26,000 | 59,173 | 2,958 |
| Inventories | 7,495 | 6,693 |
| Prepaid expenses | 4,650 | 6,708 |
| Total Current Assets | 969,742 | 448,877 |
| Property and Equipment, net | 21,088 | 22,603 |
| Total Assets | $ 990,830 | $ 471,480 |
| LIABILITIES AND STOCKHOLDERS EQUITY (DEFICIT) | | |
| Current Liabilities: | | |
| Accounts payable | $ 37,400 | $ 1,581,943 |
| Accrued expenses | 285,372 | 159,932 |
| Accrued expense - Mitsubishi litigation | -- | 8,174,518 |
| Total Current Liabilities | 322,772 | 9,916,393 |
| Prepayment on Stock and Subscription Receivable | 92,008 | 314,230 |
| Total Liabilities | 414,780 | 10,230,623 |
| Commitments and Contingencies | | |
| Stockholders' Equity (Deficit): | | |
| Convertible preferred stock, par value $1.00; authorized 10,000,000 shares, 276,000 shares of Series H authorized, 1,000 shares issued | 1,000 | 1,000 |
| Common stock, par value $.01; authorized 20,000,000 shares, 15,078,598 shares issued | 150,786 | 150,786 |
| Subscription receivable | (386,138) | (560,176) |
| Additional paid-in capital | 13,420,192 | 13,372,008 |
| Accumulated deficit | (12,609,790) | (22,722,761) |
| Total Stockholders' Equity (Deficit) | 576,050 | (9,759,143) |
| Total Liabilities and Stockholders' Equity (Deficit) | $ 990,830 | $ 471,480 |

See notes to consolidated financial statements

VERITEC, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS
YEARS ENDED JUNE 30, 2006 AND 2005

| | 2006 | 2005 |
|---|---|---|
| CONTINUING OPERATIONS | | |
| Revenues | $ 2,362,484 | $ 1,617,498 |
| Cost of Sales | 37,849 | 37,339 |
| Gross Profit | 2,324,635 | 1,580,159 |
| Operating Expenses: | | |
| General and administrative | 1,361,521 | 2,283,781 |
| Sales and marketing | 30,132 | 64,287 |
| Research and development | 193,525 | 108,675 |
| Mitsubishi litigation | -- | 8,174,518 |
| Total Operating Expenses | 1,585,178 | 10,631,261 |
| Operating Income (Loss) from Continuing Operations | 739,457 | (9,051,102) |
| Other Income (Expense): | | |
| Settlement with creditors | 9,356,948 | -- |
| Interest expense | -- | (60,035) |
| Interest income | 16,566 | 8,808 |
| Other | -- | 9,704 |
| Total Other Income (Expense) | 9,373,514 | (41,523) |
| Income (Loss) from Continuing Operations | 10,112,971 | (9,092,625) |
| DISCONTINUED OPERATIONS | | |
| Loss from Operations of VIVI-Japan | -- | (262,596) |
| Loss on Disposal of VIVI-Japan | -- | (44,092) |
| Loss from Discontinued Operations | -- | (306,688) |
| NET INCOME (LOSS) | $10,112,971 | $(9,399,313) |
| INCOME (LOSS) PER COMMON SHARE | | |
| Basic and Diluted - | | |
| Continuing operations | $ 0.67 | $ (0.82) |
| Discontinued operations | -- | (0.03) |
| | $ 0.67 | $ (0.85) |

See notes to consolidated financial statements

## VERITEC, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)
YEARS ENDED JUNE 30, 2006 AND 2005

| | Preferred Stock | | Common Stock | | Subscription | Additional Paid-in | Accumulated | Cumulative Translation | Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Receivable | Capital | Deficit | Adjustment | (Deficit) |
| BALANCE, June 30, 2004 | 76,000 | $ 76,000 | 7,071,849 | $ 70,718 | $(717,717) | $12,280,961 | $(13,323,448) | $ 10,697 | $(1,602,789) |
| Conversion of preferred stock to common stock | (75,000) | (75,000) | 750,000 | 7,500 | -- | 67,500 | -- | -- | -- |
| Conversion of notes payable at $0.10 per share to common stock | -- | -- | 5,595,358 | 55,954 | -- | 503,582 | -- | -- | 559,536 |
| Conversion of notes payable at $0.25 per share to common stock | -- | -- | 1,622,391 | 16,224 | -- | 389,374 | -- | -- | 405,598 |
| Employee stock bonus | -- | -- | 39,000 | 390 | -- | 65,910 | -- | -- | 66,300 |
| Imputed interest on subscription receivable | -- | -- | -- | -- | (64,681) | 64,681 | -- | -- | -- |
| Subscription receivable reduction | -- | -- | -- | -- | 222,222 | -- | -- | -- | 222,222 |
| Foreign currency translation adjustments | -- | -- | -- | -- | -- | -- | -- | (10,697) | (10,697) |
| Net loss | -- | -- | -- | -- | -- | -- | (9,399,313) | -- | (9,399,313) |
| BALANCE, June 30, 2005 | 1,000 | 1,000 | 15,078,598 | 150,786 | (560,176) | 13,372,008 | (22,722,761) | -- | (9,759,143) |
| Imputed interest on subscription receivable | -- | -- | -- | -- | (48,184) | 48,184 | -- | -- | -- |
| Subscription receivable reduction | -- | -- | -- | -- | 222,222 | -- | -- | -- | 222,222 |
| Net income | -- | -- | -- | -- | -- | -- | 10,112,971 | -- | 10,112,971 |
| BALANCE, June 30, 2006 | 1,000 | $ 1,000 | 15,078,598 | $150,786 | $(386,138) | $13,420,192 | $(12,609,790) | $ -- | $ 576,050 |

See notes to consolidated financial statements

# VERITEC, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS
## YEARS ENDED JUNE 30, 2006 AND 2005

| | 2006 | 2005 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net income (loss) | $10,112,971 | $(9,399,313) |
| Discontinued operations | -- | 306,688 |
| Income (loss) from continuing operations | 10,112,971 | (9,092,625) |
| Adjustments to reconcile income (loss) from continuing operations to net cash provided by operating activities: | | |
| Depreciation | 7,517 | 8,422 |
| Amortization of intangibles | -- | 13,334 |
| Stock issued for compensation | -- | 66,300 |
| Payroll applied to prepayment on subscription receivable | -- | 20,527 |
| Settlement with creditors | (9,356,948) | -- |
| Changes in operating assets and liabilities from continuing operations: | | |
| Accounts receivable | (56,215) | 914,162 |
| Inventories | (802) | 14,037 |
| Prepaid expenses | 2,058 | 101,267 |
| Accounts payables and accrued expenses | 63,327 | 323,972 |
| Accrued expense - Mitsubishi litigation | (300,000) | 8,174,518 |
| Net cash provided by operating activities from continuing operations | 471,908 | 543,914 |
| CASH FLOWS FROM INVESTING ACTIVITIES FROM CONTINUING OPERATIONS | | |
| Purchases of equipment | (6,002) | (23,693) |
| CASH FLOWS FROM FINANCING ACTIVITIES FROM CONTINUING OPERATIONS | | |
| Payments on notes payable - related parties | -- | (50,000) |
| DISCONTINUED OPERATIONS | | |
| Net cash used by operating activities | -- | (209,414) |
| Net cash provided by investing activities | -- | 30,114 |
| Net cash used by financing activities | -- | (122,740) |
| Net cash used by discontinued operations | -- | (302,040) |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | -- | (10,697) |
| NET INCREASE IN CASH | 465,906 | 157,484 |
| CASH AT BEGINNING OF YEAR | 432,518 | 275,034 |
| CASH AT END OF YEAR | $ 898,424 | $ 432,518 |

See notes to consolidated financial statements

VERITEC, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 1 - THE COMPANY AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The Company

The Company refers to Veritec, Inc. (Veritec) and its wholly owned subsidiaries, Veritec Iconix Ventures, Inc. (VIVI-Japan; a Japanese company, discontinued April 2005) and VCode Holdings, Inc. (VCode).

Nature of Business

The Company is primarily engaged in the development, marketing and sales of a line of microprocessor based encoding and decoding systems that utilize Matrix Symbology technology, a two-dimensional barcode technology originally invented by the founders of Veritec under United States patents 4,924,078, 5,331,176 and 5,612,524. As more fully described below, these patents are the property of VCode. The Company's encoding and decoding systems allow a manufacturer, distributor, reseller or user of products, to create and apply unique identifiers to the products in the form of a coded symbol. The coded symbol containing the binary encoded data applied to the product enables automated manufacturing control, together with identification, tracking, and collection of data through cameras, readers and scanners also marketed by the Company. The collected data is then available for contemporaneous verification or other user definable purposes. The Company has also developed a Secured Identification System based upon its proprietary VSCode and VeriCode(R) Symbology. The Company's Secured Identification System enables the storage of images, biometric information and data for contemporaneous verification of an individual's unique identity. In addition to its United States patents, Veritec holds patents in Europe (German patent No. 69033621.7; French patent No. 0438841; and, Great Britain patent No. 0438841); and has applications pending with the United States Patent and Trademark Office for novel uses of its Multi-Dimensional Matrix Symbology.

The Company's core business is the sale of its Multi-Dimensional Matrix Symbology together with its proprietary software products for the writing and reading thereof. Veritec owned two wholly owned subsidiaries: (1) VIVI-Japan, a corporation established under the laws of Japan with its principal place of business located in Osaka, Japan; and, (2) VCode, a Minnesota corporation with offices at 2445 Winnetka Avenue North, Golden Valley, Minnesota 55427.

VIVI-Japan: VIVI-Japan was actively engaged in the development and marketing of unique applications of Veritec products within Japan and Asia. VIVI-Japan was discontinued April 2005.

VCode: In November 2003, Veritec formed VCode to which it assigned United States patents 4,924,078, 5,331,176 and 5,612,524, together with all corresponding patent applications, foreign patents, foreign patent applications, and all continuations, continuations in part, divisions, extensions, renewals, reissues and re-examinations. VCode in turn entered into an Exclusive License Agreement with VData, LLC (VData), an Illinois limited liability company unrelated to Veritec. The purpose of the Exclusive Licensing Agreement is to allow VData to pursue enforcement and licensing of the patents against parties who wrongfully exploit the technology of such patents. VData is the wholly owned subsidiary of Acacia Research Corporation (NASDAQ: ACTG) (collectively Acacia).

The Exclusive License Agreement provides that all expenses related to the enforcement and licensing of the patents will be the responsibility of VData, with the parties sharing in the net proceeds, as specified under the terms of the agreement, arising from enforcement or licensing of the patents.

Bankruptcy Considerations

In February 2005, an adverse ruling was made against Veritec and in favor of Mitsubishi Corporation (Mitsubishi), resulting in a monetary award of $8,174,518 to Mitsubishi and enjoining Veritec and by extension Veritec's customers from the future use or sale of what was ruled as Mitsubishi's Error Detection and Correction Technology. This ruling compelled Veritec to file a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court (Bankruptcy Court) for the District of Minnesota, on February 28, 2005.

In December 2005, the Bankruptcy Court converted the Chapter 11 proceeding to Chapter 7 of the Bankruptcy Code. Under Chapter 7, Veritec would be liquidated and the shareholders would not receive anything upon liquidation.

Veritec's Third Amended Plan of Reorganization, with proof of acceptability of its provisions by Mitsubishi and the majority of the other classes of creditors, was formally submitted to the Bankruptcy Court with a motion requesting reconversion of Veritec's case in bankruptcy to Chapter 11. This motion and related order was approved in March 2006. In March 2006, the order was executed subject only to approval of the majority of creditors and shareholders of record, which was subsequently obtained.

Upon execution of the order, Veritec once again became a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court. In general, as a debtor-in-possession, Veritec was authorized under Chapter 11 to continue to operate as an ongoing business, but could not engage in transactions outside the ordinary course of business without the prior approval of the Bankruptcy Court.

In April 2006, Veritec's Third Amended Plan of Reorganization was confirmed by the Bankruptcy Court. On August 8, 2006, after resolution of all disputed creditor claims, Veritec received from the Bankruptcy Court an Order and Final Decree closing the Chapter 11 case in its entirety. As reflected in these Consolidated Financial Statements, Veritec was relieved of $9,356,948 in debt including $7,874,518 owed to Mitsubishi.

Veritec had not filed any reports required under the Securities Act Exchange Act of 1934 while in Bankruptcy. Veritec is in the process of filing past due reports.

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of Veritec, VIVI-Japan, and VCode. All inter-company transactions and balances were eliminated in consolidation.

Accounting for Discontinued Operations

Under the provisions of Statement of Financial Accounting Standard (SFAS) No. 144, if a component of an entity is either classified as held-for-sale or has been disposed of during the period, the results of its operations are to be reported in discontinued operations, provided that both of the following conditions are met:

a. The operations and cash flows of the component have been or will be removed from the ongoing operations of the entity as a result of the disposal transaction, and

b. The entity will have no significant continuing involvement in the operations of the component after the disposal transaction.

The Company liquidated its VIVI-Japan operations in April 2005. Management believes that the conditions for reporting VIVI-Japan as a discontinued operation under the above requirements of SFAS No. 144 were appropriate.

Use of Estimates

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that may affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Cash Concentrations

The Company maintains cash in a financial institution located in Minnesota. At times, this balance may exceed federally insured limits of $100,000. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on its cash balances.

Accounts Receivable

The Company sells to domestic and foreign companies and grants uncollateralized credit to customers, but requires deposits on unique orders. Management periodically reviews its accounts receivable and provides an allowance for doubtful accounts after analyzing the age of the receivable, payment history and prior experience with the customer. The estimated loss that management believes is probable is included in the allowance for doubtful accounts.

While the ultimate loss may differ, management believes that any additional loss will not have a material impact on the Company's financial position. Due to uncertainties in the settlement process, however, it is at least reasonably possible that management's estimate will change during the near term.

Inventories

Inventories, consisting of purchased components for resale, are stated at the lower of cost or market, applying the first-in, first-out (FIFO) method.

Property and Equipment

Property and equipment are stated at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of 3 to 7 years. When assets are retired or otherwise disposed of, the cost and related accumulated depreciation are removed from the accounts and the resulting gain or loss is recognized in income. The cost of maintenance and repairs is expensed as incurred; significant renewals and betterments are capitalized.

Financial Instruments

The fair value of cash, accounts receivable, accounts payable, accrued expenses, and short-term debt approximate their carrying values due to the short-term nature of these financial instruments.

The subscription receivable approximates fair value as a result of the 10% interest rate used for imputing interest. No quoted market value is available for this instrument.

Revenue Recognition

The Company accounts for revenue recognition in accordance with Security and Exchange Commission (SEC) Staff Accounting Bulletin (SAB) No. 101 "Revenue Recognition in Financial Statements" and related amendments. Revenues from software sales, product sales and engineering are recognized when products are shipped or services performed. License fees are recognized upon completion of all required terms under the agreement. The process typically begins with a customer purchase order detailing its hardware specifications so the Company can customize its software to the customer's hardware. Once customization is completed, the Company typically transmits the software to the customer via the Internet. Revenue is recognized at that point. Once the software is transmitted, the customers do not have a right of refusal or return. Under some agreements the customers remit payment prior to the Company having completed customization or completion of any other required services. In these instances, the Company delays revenue recognition and reflects the prepayments as customer deposits.

Shipping and Handling Fees and Cost

Shipping and handling fees billed to customers are included in revenues and shipping and handling costs are included in cost of sales.

Research and Development

Research and development costs are expensed as incurred.

Income (Loss) per Common Share

Basic net income (loss) per common share is computed by dividing the income (loss) available to common stockholders by the weighted-average number of common shares outstanding for the year. Diluted net income (loss) per common share, in addition to the weighted average determined for basic net income (loss) per common share, includes potential dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock. Potentially dilutive instruments include stock options, warrants, and preferred stock. For the year ended June 30, 2005, the stock options, warrants and preferred stock were antidilutive and, therefore, were not included in the computations of diluted net loss per common share.

Diluted net income per common share for the year ended June 30, 2006, was computed as follows:

| | |
|---|---|
| Net income for per share computation | $10,112,971 |
| | =========== |
| Weighted average shares outstanding | 15,078,598 |
| Incremental shares from assumed exercise or conversion of dilutive instruments: | |
| Options and warrants | 18,750 |
| Preferred stock | 10,000 |
| | ----------- |
| Shares outstanding - diluted | 15,107,348 |
| | =========== |

Stock-Based Compensation

The Company followed the accounting guidance of Accounting Principles Board (APB) Opinion No. 25, "Accounting for Stock Issued to Employees," for measurement and recognition of stock-based transactions with employees. No compensation cost was recognized for options issued under the plans when the exercise price of the options was at least equal to the fair market value of the common stock at the date of grant. Had compensation cost for the stock options issued been determined based on the fair value at the grant date, consistent with the provisions of SFAS No. 123, "Accounting for Stock-Based Compensation," the effect on the Company's 2005 net loss and loss per common share would have been insignificant.

The Financial Accounting Standards Board issued SFAS No. 123(R), "Share-Based Payment", in December 2004, which requires the cost of employee compensation paid with equity instruments to be measured based on grant-date fair values and recognized over the vesting period. The new rule allowed companies to implement SFAS No. 123(R) at the beginning of their fiscal year that begins after June 15, 2005. Under the new rule, SFAS No. 123(R) became effective for the Company on July 1, 2005. Adoption of SFAS No. 123(R) had no impact on the Company's consolidated financial statements as all options were fully-vested at the adoption date.

NOTE 2 - GOING CONCERN

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. The Company has relied on The Matthews Group for funding. Through November 2006, The Matthews Group has funded $1,666,082, including prepayments, of the original of $2,000,000 stock subscription receivable.

In fiscal year 2005, related party indebtedness, including additional accrued interest, was satisfied by reducing the prepayment on subscription receivable account for $411,782, payment of $50,000 of debt plus interest, and conversion of $965,134 into shares of common stock. As of June 30, 2005, there is no related party indebtedness.

In February 2005, Veritec filed for bankruptcy protection under Chapter 11 and emerged from bankruptcy in August 2006. As reflected in these Consolidated Financial Statements, Veritec was relieved of $9,356,948 in debt including $7,874,518 owed to Mitsubishi.

As of June 30, 2006 and 2005, the Company has recognized licensing revenue of $769,267 and $57,280, respectively, through its relationship with Acacia. The Company has received additional licensing revenue from Acacia of $644,783 in fiscal year 2007.

As of November 13, 2006, the Company had consolidated cash balances of $1,038,381, which the Company believes are sufficient to meet our short-term needs. However, the Company may need additional capital to continue to develop and expand.

NOTE 3 - DISCONTINUED OPERATIONS

Revenues of discontinued operations were $210,300 for the year ended June 30, 2005.

NOTE 4 - PROPERTY AND EQUIPMENT

Property and equipment consisted of the following:

| | June 30, | |
|---|---|---|
| | 2006 | 2005 |
| Furniture and equipment | $62,159 | $56,157 |
| Vehicles | 35,301 | 35,301 |
| | 97,460 | 91,458 |
| Less accumulated depreciation | 76,372 | 68,855 |
| | $21,088 | $22,603 |

NOTE 5 - NOTES PAYABLE - RELATED PARTIES

In October 2002, the Company's President, Van Tran, loaned $90,000 to the Company for working capital. This note was unsecured, bore 10% interest and was due on demand. Interest expense on this note was $5,144 in 2005. Accrued interest on this note totaled $20,777 at February 28, 2005. The note payable and accrued interest were converted as a payment towards the prepayment on the subscription receivable account as of February 28, 2005.

In fiscal years 2003 and 2002, The Matthews Group loaned the Company an aggregate of $200,000 for working capital. These notes were unsecured, bore 10% interest and were due May 25, 2003 to June 23, 2003. Interest expense on these notes totaled $13,334 in 2005. Accrued interest on these notes totaled $42,604 at February 28, 2005. The notes payable and accrued interest were converted as a payment towards the prepayment on the subscription receivable account as of February 28, 2005.

In June 2003, Veritec entered into an agreement to purchase The Matthews Group's 50% ownership of VIVI-USA. As part of this agreement, the Company issued The Matthews Group a promissory note of $50,000. The promissory note to The Matthews Group bore interest at 10% and was due June 25, 2004. Interest expense on this note was $3,333 in 2005 and 2004, respectively. Accrued interest on this note totaled $8,401 at February 28, 2005.

The note payable and accrued interest were converted as a payment towards the prepayment on the subscription receivable account as of February 28, 2005.

In November 2003, a consultant and shareholder of the Company loaned $50,000 to the Company for working capital. This note was unsecured, bore 10% interest and was due November 12, 2004. Interest expense on this note totaled $833 in 2005 (including 2,500 shares of common stock to be issued). This note payable and accrued interest totaling $50,833 were repaid in August 2004. The issuance of the stock remains unsatisfied.

NOTE 6 - CONVERTIBLE NOTES - RELATED PARTIES

In April 2002, The Matthews Group loaned $100,000 to the Company for working capital and to fund its investment in VIVI-USA. This note was convertible at the option of the holder into common shares of the Company at a convertible rate of $0.25 per share. This note was unsecured, bore 10% interest and was due March 28, 2003. Interest expense on this note was $6,070 in 2005. Accrued interest on this note totaled $27,576 at December 31, 2004. On December 22, 2004, The Matthews Group exercised its right to convert the principal amount and all accrued, unpaid interest into common stock of the Company as of December 31, 2004. The note and accrued unpaid interest of $27,576 at December 31, 2004, were converted into 510,302 shares of common stock.

The Matthews Group paid an obligation on behalf of the Company to holders of secured notes payable, collectively called "The Gant Group." Payments by The Matthews Group to The Gant Group totaled $366,522 (principal - $286,453; interest - $75,069; and legal fees - $5,000). The amount paid to The Gant Group plus accrued interest of $30,853 owed to The Matthews Group on these advances was incorporated into a $397,375 note on December 1, 2000. The note was convertible at the option of the holder into common shares of the Company at a convertible rate of $0.10 per share. This note was unsecured, bore 10% interest and was due on demand. Interest expense on this note was $19,868 in 2005. Accrued interest on this note totaled $162,161 at December 31, 2004. As of December 31, 2004, the principal amount of $397,375 and accrued unpaid interest of $162,161 were converted into 5,595,358 shares of common stock.

In November 2003, Van Tran (Veritec CEO) and Larry Johanns (a principal of The Matthews Group) loaned $250,000 to the Company for working capital. The notes were convertible at the option of the holders into common shares of the Company at a conversion rate of $0.25 per share. These notes were unsecured, bore 10% interest and were due November 14, 2004. Interest expense on this note was $12,200 in 2005. Accrued interest on this note totaled $28,022 at December 31, 2004. As of December 31, 2004, the principal amount of $250,000 and accrued unpaid interest of $28,022 were converted into 1,112,089 shares of common stock.

NOTE 7 - PREPAYMENTS ON SUBSCRIPTION RECEIVABLE

The Matthews Group made prepayments against the Company's subscription receivable (Note 8). These prepayments are unsecured and noninterest bearing. It is assumed the prepayment on the subscription receivable at June 30, 2006, will also ultimately be applied against the subscription receivable.

NOTE 8 - STOCKHOLDERS' EQUITY ( DEFICIT)

Preferred Stock

The Articles of Incorporation of Veritec authorize 10,000,000 shares of preferred stock with a par value of $1.00 per share. The Board of Directors is authorized to determine any number of series into which shares of preferred stock may be divided and to determine the rights, preferences, privileges and restrictions granted to any series of the preferred stock.

As part of the bankruptcy Plan of Reorganization approved in 1999, a new Series H convertible preferred stock was authorized. The Plan called for Veritec to issue 275,000 shares of restricted Series H convertible preferred stock in exchange for assets of $2,000,000 being invested into Veritec. Each share of Series H convertible preferred stock is convertible into 10 shares of the Veritec's common stock at the option of the holder.

In September 1999, The Matthews Group received 275,000 shares of Series H convertible preferred stock in exchange for a promissory note in the amount of $2,000,000. The Matthews Group exercised the conversion privilege and converted 200,000 preferred shares to 2,000,000 shares of common stock.

In December 2004, The Matthews Group exercised the conversion privilege of their remaining balance of Series H convertible preferred stock and converted 75,000 preferred shares into 750,000 shares of common stock. The remaining 1,000 shares of Series H convertible preferred stock issued and outstanding is owned by an unrelated party.

Stock Bonus

In January 2005, the Company issued 39,000 shares to employees as stock bonuses.

Stock Options

The Company has agreements with certain employees that provide for five years of annual grants of options to purchase shares of the Company's common stock. The option price is 15% below the market price on the date of grant, the options vest one year from the date of grant, and the options expire five years after vesting. The Company issued 30,000 options under this arrangement in 2006 and entered into additional arrangements after the end of the year.

The fair value of options granted in 2006 of $0.64 per share was estimated using the Black-Scholes option pricing model with the following weighted-average assumptions: risk free interest rate - 4.96 %, dividend yield - 0%, volatility - 7.39%, and weighted average expected life - 3 years. Compensation expense related to stock options was not significant.

The Company has commitments under these agreements to issue grants of options of 110,000 for 2007, 70,000 annually for 2008 through 2010, and 40,000 in fiscal 2011.

A summary of stock options is as follows:

| | Number of Shares | Option Price Per Share |
|---|---|---|
| Balance at June 30, 2005 | 15,000 | $ .80 |
| Expired | (15,000) | $ .80 |
| Granted | 30,000 | $2.04 |
| Balance at June 30, 2006 | 30,000* | $2.04 |

* Vest in 2007; six years remaining life.

Subscription Receivable

In September 1999, the Company accepted a commitment from The Matthews Group to fund the $2,000,000 required under the bankruptcy Plan of Reorganization. This funding is a promissory note that requires monthly payments to the Company of $18,519 through fiscal 2009. These payments are noninterest bearing and are collateralized by a pledge of properties controlled by principals of The Matthews Group. A California Deed of Trust and Minnesota mortgages were filed against various pledged properties to collateralize the subscription.

The Company imputes a 10% interest rate on this subscription receivable. Imputed interest on the subscription is excluded from operating results and is instead credited directly to additional paid-in capital.

The Matthews Group has made prepayments toward this subscription receivable (Note 7).

NOTE 9 - CONCENTRATIONS

Major Customers:

Customers with revenues in excess of 10% of total revenues for 2005 and 2004 were as follows:

| | Year Ended June 30, | |
|---|---|---|
| | 2006 | 2005 |
| Customer A | 33% | 4% |
| Customer B | 27% | 8% |
| Customer C | 14% | 34% |
| Customer D | 2% | 21% |
| Customer E | -- | 12% |
| Customer F | -- | 10% |
| | 76% | 85% |

At June 30, 2005, Customer B accounted for 24% of the accounts receivable.

Major Suppliers:

In 2006 and 2005, the Company used one supplier for its hand-held scanner purchases. However, due to the fact that many manufacturers' hand-held scanners are capable of porting the Company's software products, the Company does not believe it is at risk to the marketplace.

Foreign Revenues:

Foreign revenues accounted for 65% of the Company's revenues in fiscal 2006 and 63% in fiscal 2005. These revenues are concentrated in Japan, Korea and Taiwan.

NOTE 10 - INCOME TAXES

Deferred income taxes are provided on the liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized.

Veritec and VIVI-Japan file separate income tax returns in the United States and in Japan, respectively. VCode is included in the income tax returns of Veritec.

A reconciliation between the expected federal income tax rate and the actual tax rate is as follows:

| | Year Ended June 30, | | | |
|---|---|---|---|---|
| | 2006 | | 2005 | |
| | Amount | Percent | Amount | Percent |
| Expected federal tax (benefit) | $ 3,438,400 | 34.0% | $(3,196,000) | (34.0)% |
| State income tax, net of federal tax benefit | 654,100 | 6.5 | (607,900) | (6.5) |
| Net operating losses expired | -- | -- | 218,700 | 2.3 |
| Valuation and utilization of deferred tax assets | (4,081,800) | (40.4) | 3,579,300 | 38.1 |
| Other | (10,700) | (0.1) | 5,900 | 0.1 |
| Income tax expense (benefit) | $ -- | --% | $ -- | --% |

Deferred income tax assets have been reduced by a valuation allowance as it is more likely than not that they will not be realized. The following is a summary of the deferred tax assets:

| | June 30, | |
|---|---|---|
| | 2005 | 2006 |
| Allowance for doubtful accounts | $ 11,300 | $ 10,600 |
| Inventory valuation allowance | -- | 12,400 |
| Intangible assets | 45,000 | 39,600 |
| Accrued expenses | 5,400 | 4,900 |
| Mitsubishi litigation | -- | 3,308,100 |
| Net operating loss carryforwards | 2,717,500 | 3,485,400 |
| Deferred tax asset | 2,779,200 | 6,861,000 |
| Valuation allowance | (2,779,200) | (6,861,000) |
| Net deferred tax asset | $ -- | $ -- |

Veritec has net operating loss carryforwards available to offset future taxable income that expire as follows (year ending June 30):

| Year | Federal | Minnesota |
|---|---|---|
| 2007 | $ 190,400 | $ -- |
| 2008 | 1,410,000 | -- |
| 2009 | 1,227,000 | -- |
| 2010 | 457,000 | -- |
| 2011 | 301,000 | -- |
| 2017 | 480,000 | -- |
| 2018 | 451,000 | -- |
| 2019 | 330,000 | -- |
| 2020 | 654,000 | -- |
| 2021 | 105,000 | -- |
| 2022 | 794,000 | -- |
| 2023 | 1,454,000 | 732,400 |
| | $7,853,400 | $732,400 |

NOTE 11 - COMMITMENTS AND CONTINGENCIES

Operating Leases

The Company leases its U.S. office facilities from its President, Van Tran, under a lease expiring June 30, 2007 and requires monthly payments of $3,150 plus common area costs. The Company leases a house in Plymouth, MN on a month-to-month basis from a principal of The Matthews Group for purposes of housing customers, guests and consultants. The Company leased its Japanese office facilities under a lease that expired February 28, 2006 and required monthly payments of 243,000 Yen plus common area costs. As of June 30, 2005, due to the discontinuance of VIVI-Japan, Veritec had no further responsibility for lease payments in Japan. Rent expense for continuing operations to related parties was $55,800 and $54,300 in 2006 and 2005, respectively. Future annual operating lease minimum payments total $37,800 in fiscal year 2007.

Contingencies

During the 1995 - 1997 bankruptcy, the Company sought an investment group to assist funding the $2,000,000 under the Plan of Reorganization approved by the Bankruptcy Court in 1997. In the intervening years, various investment groups attempted to help the Company fund this required investment. Partial funding received from these investment groups were settled through stock issuances by the Company. One of these former investment groups has made claims totaling $166,697 against the Company, $90,980 in cash and $75,717 in stock (94,646 shares at $.80 per share), but has not pursued legal action relating to these claims. It is possible that other investment groups will assert claims against the Company regarding their efforts to secure funding on behalf of the Company. Management believes it has appropriately reflected the activity with these investment groups in the accompanying consolidated financial statements. Management further feels these claims were settled in the bankruptcy. Due to uncertainties, however, it is at least reasonably possible that claims will be asserted and/or pursued. The ultimate outcome of these claims, if asserted and/or pursued, cannot presently be determined.

On June 30, 2000, we were served as a defendant in the matter of Starosolsky vs. Veritec, Inc., et al., in the United States District Court for the Central District of California. This suit was brought by a shareholder and former director of the Company against Veritec and various individuals claiming that certain corporate actions were taken without proper authority of the Company's Board of Directors and/or contrary to the plan of reorganization the Company filed and completed under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court in the 1990's. The complaint seeks equitable relief to set aside the issuance of Series H preferred stock (now converted into common stock) issued to The Matthews Group that was authorized by the previous approved bankruptcy reorganization plan in 1999, to prevent The Matthews Group from voting its stock at any meetings of stockholders and to remove certain of the individual defendants as directors of the Company. In December 2000, this case was transferred to the United States District Court for the District of Minnesota. The case has lingered without prosecution. Consequently, management is not able to express an opinion on the likely outcome.

On January 10, 2002, Veritec initiated arbitration against Mitsubishi in Los Angeles, California, alleging breach of contract, trade secret misappropriation and interference with business opportunities; seeking several million dollars in compensatory damages, punitive damages, legal fees and accrued interest. Mitsubishi counterclaimed on similar grounds and sought to enjoin Veritec's use of the Error Detection and Correction Technology which Mitsubishi claimed as its sole and separate property. Evidentiary hearings were conducted from the later part of August through September 4, 2004. On February 15, 2005, Veritec received notice from the International Court of Arbitration that it awarded Mitsubishi a total of $8,174,518 in monetary damages and enjoined Veritec's use or sale of the Error Detection and Correction Technology it deemed to be the sole property of Mitsubishi. As a result, on February 28, 2005, Veritec filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota. On December 16, 2005, the Bankruptcy Court converted Veritec's Chapter 11 case in bankruptcy to a Chapter 7 and the Bankruptcy Court ordered all assets of the Company to be turned over to the control of the Trustee.

In February 2006, Veritec and Mitsubishi entered into a Settlement Agreement whereby, in exchange for $300,000, a license to utilize Veritec's VeriCode(R) Technology, and dismissal of the patent infringement litigation filed by VData and VCode against Mitsubishi, Mitsubishi waived its right to the $8,174,518 and granted Veritec a license to use the Mitsubishi Error Detection and Correction Technology. In light of the Settlement Agreement entered into with Mitsubishi, on March 8, 2006, the Bankruptcy Court ruled in favor of reconverting Veritec's case in bankruptcy back to one under Chapter 11 of the Bankruptcy Code. Veritec's Third Amended Plan of Reorganization was formally filed with the Court on March 13, 2006. In April 2006, Veritec's

Third Amended Plan of Reorganization was confirmed by the Bankruptcy Court. On August 8, 2006, after resolution of disputed creditor claims, Veritec received from the Bankruptcy Court an Order and Final Decree Closing the Chapter 11 case in its entirety. As reflected in these Consolidated Financial Statements, Veritec was relieved of $9,356,948 in debt including $7,874,518 owed to Mitsubishi.

VCode joined with VData as Plaintiffs in patent enforcement litigation filed on October 25, 2004, against Adidas America, Inc., Adidas Solomon AG, Advanced Micro Devices, Inc., Boston Scientific Corporation, Stamps.com and Hitachi Global Storage Technologies (Thailand) Ltd., in the United States District Court for the District of Minnesota. Adidas America, Inc., Advanced Micro Devices, Inc., Boston Scientific and Stamps.com filed Counterclaims in those actions. All Defendants have since settled and entered into licensing agreements for use of the technology under the Company's patents.

VCode joined with VData as Plaintiffs in patent enforcement litigation filed on September 8, 2005, against Mitsubishi Corporation in the United States District Court for the District of Minnesota, alleging violations of the Company's patents. This matter was dismissed as a part of the Settlement Agreement with Mitsubishi described above.

VCode joined with VData as Plaintiffs in patent enforcement litigation filed on October 4, 2005, against Brother Industries, Ltd., Sato Corporation, Toshiba Corporation and US Bank National Association in the United States District Court for the District of Minnesota alleging violations of the Company's patents. US Bank National Association has entered into a licensing agreement with the Company and the case as to that defendant was dismissed as well as the case against Sato Corporation. No opinion can be rendered at this time with respect to the outcome of this action as to the remaining defendants.

On January 26, 2006, Hartz Mountain Corporation, in response to a notice of infringement sent to it by VData, filed a preemptive action seeking a Declaratory Judgment against VData and the Company in the United States District Court for the District of New Jersey. Amongst other remedies the action sought a ruling from the Court that the Company's 4,924,078, 5,331,176 and 5,612,524 patents were not enforceable against Hartz Mountain and its related companies. The Company has been advised by legal counsel that the preemptive filing of a Declaratory Judgment action is commonplace in the enforcement areas of patent law and practice. The Company joined VData with the filing of a cross complaint against Hartz Mountain seeking amongst other remedies, monetary damages for past infringement and future use of the knowledge learned from the Company's patents. Hartz Mountain entered into a licensing agreement with VData and the Company whereupon Hartz Mountain dismissed its action for Declaratory Judgment and VData and the Company dismissed their actions against Hartz Mountain.

On March 13, 2006, in response to notices of infringement sent to their customers by VData, Cognex Corporation filed a preemptive action seeking a Declaratory Judgment against VData and the Company in the United States District Court for the District of Minnesota. Amongst other remedies the action seeks a ruling from the court that the Company's 5,612,524 patent is not enforceable against Cognex Corporation and its customers. Presently, the Company is conferring with VData and the legal counsel retained by VData to defend against this action. Due to the recent nature of the case, only jurisdictional and procedural issues have been litigated and a responsive pleading on behalf of VData and the Company has not yet been filed. The Company cannot render an opinion at this time with respect to the outcome of these actions.

On March 22, 2006, the United States Patent and Trademark Office granted an application made for an Ex Parte Reexamination of the Company's 5,612,524 patent. The Company is conferring with VData, and counsel retained by VData, to file the Company's reply to the applicant's submission.

Due to the recent nature of this matter, a response on behalf of VCode has not yet been filed with the United States Patent and Trademark Office. The Company has been advised by legal counsel that a preemptive filing of such a request for Ex Parte Reexaminations is commonplace in the enforcement areas of patent law and practice. The Company is confident in its patent but cannot render an opinion at this time with respect to the outcome of the reexamination. However, not all claims of the patent have been challenged and the Company believes that a determination adverse to the patent would not be detrimental to the Company's ability to market its products, but could be detrimental to collection of licensing fees based upon this patent.

On May 23, 2006, VCode joined with VData as a Plaintiff in a pending patent enforcement litigation filed against Aetna, Inc., PNY Technologies, Inc., Merchants' Credit Guide Co., The Allstate Corporation, and American Heritage Life Insurance Company in the United States District Court for the District of Minnesota alleging violations of the Company's patents. The Allstate Corporation and American Heritage Life Insurance Company have entered into a licensing agreement with the Company and the case as to those defendants has been dismissed. Aetna, Inc., and Merchants' Credit Guide Co., have filed responsive pleadings in the action. No opinion can be rendered at this time with respect to the outcome of this action as to the remaining defendants.

On September 5, 2006, an application was made for an Ex Parte Reexamination of the Company's 4,924,078 patent. The Company is awaiting a determination from the United States Patent and Trademark Office if it will grant reexamination on the Application. The Company has conferred with VData, and the legal counsel retained by VData, to file the Company's reply to the applicant's submission should it be granted. Due to the recent nature of this matter, a response on behalf of VCode is not yet required. The Company is confident in its patent but cannot render an opinion at this time with respect to the outcome of the reexamination. However, the Company believes that a determination adverse to the patent would not be detrimental to the Company's ability to market its products, but could be detrimental to collection of licensing fees based upon this patent.

We are subject to the continuing reporting obligations of the Securities Exchange Act of 1934 (the 1934 Act), which, among other things, requires the filing of quarterly and annual reports and proxy materials with the SEC. Prior to September 1999 and periodically thereafter, we did not comply with several filing requirements. To our knowledge, there is no current inquiry or investigation pending or threatened by the SEC in connection with our prior reporting violations. However, there can be no assurance that we will not be subject to such inquiry or investigation in the future. As a result of any potential or pending inquiry by the SEC or other regulatory agency, we may be subject to penalties, including among other things, suspension of trading in our securities, court actions, administrative proceedings, preclusion from using certain registration forms under the 1933 Act, injunctive relief to prevent future violations and/or criminal prosecution.

NOTE 12 - SUPPLEMENTAL CASH FLOW INFORMATION

Cash paid for interest was $833 for the year ended June 30, 2005.

Summary of Noncash Activity:

In fiscal year 2006, $9,356,948 of accounts payable and accrued expenses was relieved as a bankruptcy settlement with creditors.

In fiscal year 2006 and 2005, the Company reduced subscriptions receivable by $222,222 through a reduction of the prepayment on stock and subscription receivable.

In fiscal year 2005, the convertible notes payable - related party and the related accrued interest of $965,134 were converted into 7,217,749 shares of common stock.

In fiscal year 2005, the Company converted notes payable - related party and the related accrued interest of $411,782 into prepayment on stock and subscription receivable.

In fiscal year 2005, the Company's President, Van Tran, contributed deferred compensation of $84,333 owed her to the prepayment on stock and subscription receivable.

In fiscal year 2005, The Matthews Group exercised their remaining balance of preferred stock and converted 75,000 preferred shares into 750,000 shares of common stock.

ITEM 8 CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURES

None

ITEM 8A CONTROLS AND PROCEDURES

Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. It was concluded that, as of the end of such period, our disclosure controls and procedures are effective.

Internal Control over Financial Reporting

There have not been any changes in our internal control over financial reporting during the fiscal year to which this report relates that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

The quarterly review process in fiscal 2006 and the audits of our June 30, 2006 and 2005, consolidated financial statements revealed a need for stronger controls over our financial reporting system. Improvements needed related to a general lack of accounting staff. During the bankruptcy period, the Company utilized a consultant for its accounting and financial reporting system. As a result, certain controls were limited. When the Company emerged from bankruptcy, we responded to these concerns by hiring a full time Chief Financial Officer.

Our management, including our Chief Executive Officer and former Chief Financial Officer Van Tran, do not expect that our disclosure controls and procedures will prevent all errors and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our Company have been detected. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, control may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

ITEM 8B OTHER INFORMATION

None

PART III

ITEM 9 DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS AND CORPORATE GOVERNANCE; COMPLIANCE WITH SECTION 16 (a) OF THE EXCHANGE ACT.

The members of the present Board of Directors and Officers are:

| Name | Office | Age | Director Since |
|---|---|---|---|
| Mr. Larry Matthews | Director | 78 | 1999 |
| Mr. Dean Westberg | Director | 73 | 2003 |
| Ms. Van Thuy Tran | Director, CEO, Treasurer, Secretary | 61 | 1999 |

Each director will serve until the next annual meeting of shareholders, or until their respective successors have been elected and duly qualified. Directors serve one-year terms. The Board of Directors appoints officers. There are no family relationships between any director and officer.

Mr. Larry Matthews was appointed as Acting President and Chief Executive Officer and Director on January 28, 1999, in conjunction with a plan from "The Matthews Group" to evaluate and possibly fund us out of bankruptcy. Mr. Matthews was Chairman and Co-Owner of Vendtronics (sold to Food Engineering Corporation) from 1994 to 1998. From 1963 to 1983 he had various positions at Control Data Corporation, including Vice President of Operations. Currently, Mr. Matthews is on the Board of Directors of Artesyn Technologies (merger of ZYTEC, of which he was a cofounder, and Computer Products), Crosswork, Inc., Third Wave Systems, Solar Attic and ECO Fuels.

Mr. Dean W. Westberg was with 3M for 37 years, most of that time as a photographic chemist. At 3M he did factory scale-up of introductory photographic and printing products, quality control and technical service work; and he spent much time in trouble shooting for 3M. After retiring from 3M he expanded his education in international law and foreign trade. He became involved with various start-up companies in establishing trading relations between the United States and Asia. He has established a company to link small businesses in Mexico and the United States with larger North American companies. Mr. Westberg has a B.S. from Hamline University in chemistry and mathematics. He has studied at University of St. Thomas with specialties in international finance, international marketing, and law.

Ms. Van Thuy Tran is the current CEO of the Company. Ms. Tran was President of Asia Consulting and Trading Company, a company dealing with trade in the Pacific Rim countries. She is the co-founder of Circle of Love, providing mission works in Vietnam. She was the founder of Equal Partners, Inc., a construction and building company in Minnesota. Ms. Van Tran has a medical degree and worked in the medical field for over 17 years. For the last twenty years, she has been an entrepreneur involved in building businesses, providing opportunity for minorities and creating solutions for people in distress.

Section 16(a) Beneficial Ownership Reporting Compliance

Based solely upon a review of Forms 3 and 4 and amendments thereto furnished to us under Rule 16a-3(e) during fiscal 2006 and Form 5 and amendments thereto furnished to us with respect to fiscal 2006, no person who was a director, officer, or beneficial owner of more than ten percent of any class of our common stock failed to file on a timely basis reports required by Section 16(a) of the Securities Exchange Act during our most recent fiscal year or prior fiscal years.

Committee and Board Meetings

Three meetings of our Board of Directors were held in fiscal 2006, and all board members attended all meetings. We have no standing audit, nominating or compensation committees of our Board or committees performing similar functions during fiscal 2006. The directors have regularly communicated to discuss our affairs in addition to formal board meetings to transact and approve appropriate business. Our Board has determined that we do not have an audit committee financial expert. We do not have an audit committee financial expert given the small size of our Company and business and/or inability to attract a board member who would qualify as a financial expert given our current financial position.

Code of Ethics

We have not adopted a code of ethics.

Directors Compensation

Non-employee directors have the right to receive director's fees of $150 for each meeting attended. These directors' fees totaled $150 in fiscal 2006 and $750 in fiscal 2005.

ITEM 10 EXECUTIVE COMPENSATION

Van Thuy Tran, CEO, received compensation in the amount of $240,000, including a bonus of $90,000 for bringing the Company out of bankruptcy, for the fiscal year June 30, 2006 and $150,000 for fiscal year 2005. Ms. Tran received no other compensation from the Company. Gerald Fors, CFO, hired May 2006, received compensation in the amount of $10,625 for the fiscal year ended June 30, 2006. Mr. Fors received no other compensation from the Company.

Compensation Pursuant To Plans Including Pension, Stock Option, and Stock Appreciation Rights Plans

In 2006, the Company entered into an employment agreement with its Chief Financial Officer that provides for five years of annual grants of 30,000 options to purchase shares of the Company's common stock. The option price is 15% below the market price on the date of grant, the options vest one year from the date of grant, and the options expire five years after vesting. The Company issued 30,000 options in 2006 and has a remaining commitment to issue 120,000 options to the Chief Financial Officer.

As of June 30, 2006, there were no other stock option plan, stock appreciation rights plans, phantom stock plans, or other incentive or compensation plan pursuant to which benefits, remuneration, value or compensation was or is to be granted, awarded, set aside, or accrued for the benefit of any of our executive officers.

ITEM 11 SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The following table sets forth, as of June 30, 2006 certain information with respect to all shareholders known by us to be beneficial owners of more than 5% of our outstanding common stock, all directors, and all of our officers and directors as a group.

| Name & Address | Number of Shares Beneficially Owned | Percent of Shares |
|---|---|---|
| | Common (see notes 1 and 2 below) | Common |
| Larry Matthews<br>7601 5th Avenue, Richfield, MN 55423 | None | N/A |
| Dean Westberg<br>4124 Jay Lane, White Bear Lake, MN 55110 | 55,000 | 0.4% |
| Van Thuy Tran (see note 1)<br>1430 Orkla Drive, Golden Valley, MN 55427 | 4,345,859 | 28.2% |
| The Matthews Group (see note 2)<br>1430 Orkla Drive, Golden Valley, MN 55427 | 8,533,218 | 56.6% |
| Larry Johanns (see note 1)<br>518 North 12 Street, Osage, IA 50461 | 4,584,541 | 30.4% |
| All Officers and Directors as a group (3 persons)<br>Van Thuy Tran and Larry Matthews | 8,985,400 | 59.6% |

(1) The above shares include 50% of the shares owned or issuable to The Matthews Group. Van Thuy Tran and Larry Johanns each own 50% of The Matthews Group.

(2) Includes 750,000 shares issued in the conversion of 75,000 shares of the Series H preferred stock and 7,217,749 shares as a result of the conversion of the convertible notes payable and related accrued interest.

ITEM 12 CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

Subscription Receivable

In September 1999, we accepted a commitment from The Matthews Group to fund the $2,000,000 required under our bankruptcy Plan of Reorganization. This funding is in the form of a promissory note that calls for 108 monthly payments to us of $18,519. These payments are non-interest bearing and are secured by a pledge of properties controlled by a principal of The Matthews Group. The note is collateralized by mortgages on income-producing real estate having an assessment value in excess of $800,000, three properties owned by Van Thuy Tran and one property by Larry Johanns. Non-exclusive of any balance in the Prepayment on Subscription Receivable, the current remaining balance on the note is $425,926.

The Matthews Group has made prepayments against its Subscription Payable to us. These prepayments are unsecured and non-interest bearing. It is assumed the prepayment of $92,008 at June 30, 2006 will also ultimately be applied against the subscription receivable.

Notes Payable - The Matthews Group

The Matthews Group paid an obligation on behalf of the Company to holders of secured notes payable collectively called "The Gant Group." Payments by The Matthews Group to The Gant Group totaled $366,522 (Principal - $286,453; interest - $75,069; and legal fees - $5,000). These amounts paid to The Gant Group plus accrued interest of $30,853 owed to The Matthews Group on these advances were incorporated into a $397,375 note on December 1, 2000. This note is unsecured, bears 10% interest and is due on demand. Interest expense on this note totaled $19,869 in 2005. Accrued interest related to this note totaled $162,162 at December 21, 2004. At the option of The Matthews Group, all or a portion of this indebtedness can be converted into Veritec, Inc. common stock at $.10 per share. As of December 31, 2004, the principal amount of $397,375 and accrued unpaid interest of $162,161 were converted into 5,595,358 shares of common stock.

In fiscal years 2003 and 2002, The Matthews Group loaned the Company an aggregate of $200,000 for working capital. These notes were unsecured, bore 10% interest and were due May 25, 2003 to June 23, 2003. Interest expense on these notes totaled $13,334 in 2005. Accrued interest on these notes totaled $42,604 at February 28, 2005. The notes payable and accrued interest were converted as a payment towards the prepayment on the subscription receivable account as of February 28, 2005.

In June 2003, we entered into an agreement with The Matthews Group to purchase 50% ownership of VIVI-USA. As part of this agreement, we issued The Matthews Group a promissory note of $50,000. The promissory note to The Mathews Group bore 10% interest and was due on demand. Interest expense on this note totaled $3,333 as of June 30, 2005. Accrued interest on this note totaled $8,401 at February 28, 2005. This note payable and accrued interest, were converted as a payment towards the prepayment on the subscription receivable account as of February 28, 2005.

Other Related Party Transactions

In October 2002, our President, Van Tran, loaned $90,000 to us for working capital needs. This note is unsecured, bears interest at 10% and is due on demand. Interest expense on this indebtedness totaled $6,394 in 2005. Accrued interest on this indebtedness totaled $20,777 at February 28, 2005. The note payable and accrued interest, were converted as a payment towards the prepayment on the subscription receivable account as of February 28, 2005.

In November 2003, Van Tran and Larry Johanns (a principal of The Matthews Group) loaned $250,000 to the Company for working capital. The notes were convertible at the option of the holders into common shares of the Company at the rate of $0.25 per share. These notes were unsecured, bore 10% annual interest and were due November 14, 2004. Interest expense to these related parties on this indebtedness totaled $12,200 in 2005. As of December 31, 2004, the principal amount of $250,000 and accrued unpaid interest of $28,022 were converted into 1,112,089 shares of common stock.

In November 2003, a consultant and shareholder of the Company, Bill Newfield, loaned $50,000 to the Company for working capital. This note is unsecured, bears 10% interest payable monthly and is due November 12, 2004. Interest expense on this indebtedness totaled $833 in 2005 (including 2,500 shares of common stock to be issued). This note and all accrued interest were repaid in August 2004. The issuance of the stock remains unsatisfied.

We lease our U.S. office facilities from our President, Van Tran, under a lease running through June 30, 2007 and calling for monthly payments of $3,150 plus common area costs. The Company also leases a house on a month-to-month basis from a principal of The Matthews Group for purposes of housing customers, guests and consultants. Related party rent expense from continuing operations was $55,800 in fiscal 2006 and $54,300 in fiscal 2005.

ITEM 13 EXHIBITS

*13. Form 10-KSB for the period ended June 30, 1999, filed on October 13, 1999, and is incorporated herein by this reference.

31. CEO/CFO Certification required by Rule 13a14(a)/15d14(a) under the Securities Exchange Act of 1934.

32. Veritec, Inc. Certification of CEO/CFO pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350).

*99.1. Press Release issued by the Registrant on February 16, 2005, announcing the adverse ruling against Veritec, Inc., by the International Court of Arbitration, awarding a monetary judgment in favor of Mitsubishi Corporation of approximately $8.1 Million; and, enjoining Veritec from further violations of Mitsubishi Corporation's copyrighted Error Detection and Correction software (filed as Item 9.01 Exhibit 99.1 to Veritec's Form 8-K filed on February 17, 2005 and incorporated herein by reference)

*99.2. Notice of the Registrant having filed on February 28, 2005, a Petition for Relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court, District of Minnesota (Case Number 05-31119) (filed as Item 1.03 Bankruptcy or Receivership to Veritec's Form 8-K filed February 28, 2005 and incorporated herein by reference)

*99.3 Notice of the Registrant's case in Bankruptcy being converted to Chapter 7 of the United States Bankruptcy Code (Case Number 05-31119) (filed as Item 1.03 Bankruptcy or Receivership to Veritec's Form 8-K filed December 19, 2005 and incorporated herein by reference)

*99.4 Notice of the Registrant's case in Bankruptcy being reconverted to Chapter 11 of the United States Bankruptcy Code (Case Number 05-31119) (filed as Item 1.03 Bankruptcy or Receivership to Veritec's Form 8-K filed March 10, 2006 and incorporated herein by reference)

*99.5 Notice of the Registrant's Third Amended Plan of Reorganization being confirmed by the United States Bankruptcy Court (Case Number 05-31119) (filed as Item 1.03 Bankruptcy or Receivership and Item 9.01 Financial Statements with attached Exhibit 2.1 Order and Notice Confirming Plan and Fixing Time Limits, dated April 26, 2006; Exhibit 2.2 Debtor's Third Modified Plan of Reorganization with Settlement Agreement; and, Exhibit 99.1 Unaudited balance sheet of registrant at April 26, 2006, to Veritec's Form 8-K filed May 1, 2006 and incorporated herein by reference)

*99.6 Notice of the Registrant's receipt of "Order and Final Decree Closing Chapter 11 Case" from the United States Bankruptcy Court (Case Number 05-31119) (filed as Item 1.03 Bankruptcy or Receivership and Item 8.01 Other Events identifying the Press Release issued announcing the same, to Veritec's Form 8-K filed August 11, 2006 and incorporated herein by reference)

* As Previously Filed

With respect to the documents incorporated by reference to this Form 10-KSB, Veritec's Commission File Number is 0-15113.

ITEM 14 PRINCIPAL ACCOUNTANT FEES AND SERVICES

Audit Fees

The aggregate fees billed by Lurie Besikof Lapidus & Company, LLP for professional services rendered for the audit of our annual consolidated financial statements for fiscal year ended June 30, 2006 were $40,000 to date. The aggregate fees billed by Lurie Besikof Lapidus & Company, LLP for professional services rendered for the audit of our annual consolidated financial statements for fiscal year ended June 30, 2005 were $40,000 to date.

Audit-Related Fees

Callahan, Johnson and Associates, LLC was paid $1,939 for preparation of income tax return for fiscal year ended June 30, 2005 and 2004.

SIGNATURES

Pursuant to the requirements of Section 13 or 15 (d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

VERITEC, INC.

By /s/ Van Thuy Tran November 14, 2006

Van Thuy Tran
Director, Chief Executive

By /s/ Gerald Fors November 14, 2006

Gerald Fors
Chief Financial Officer

Pursuant to the requirements of the Securities Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Dean Westberg<br>Dean Westberg | Director | November 14, 2006 |
| /s/ Larry Matthews<br>Larry Matthews | Director | November 14, 2006 |

EXHIBIT 31.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Van Thuy Tran certify that:

1. I have reviewed this annual report on Form 10-KSB of Veritec, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the consolidated financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)4 and 15d-15(e)4) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the end of the period covered by this report based on such evaluation; and

(c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely, to materially affect, the registrant's internal control over financial reporting; and;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b) Any fraud, whether or not material, that involves management or other employees who have significant roles in the registrant's internal control over financial reporting.

Date: November 14, 2006.

/s/ Van Thuy Tran

Van Thuy Tran, Chief Executive Officer

EXHIBIT 31.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Gerald Fors certify that:

1. I have reviewed this annual report on Form 10-KSB of Veritec, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the consolidated financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)4 and 15d-15(e)4) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the end of the period covered by this report based on such evaluation; and

(c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely, to materially affect, the registrant's internal control over financial reporting; and;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b) Any fraud, whether or not material, that involves management or other employees who have significant roles in the registrant's internal control over financial reporting.

Date: November 14, 2006.

/s/ Gerald Fors
-----------------------------------------
Gerald Fors, Chief Financial Officer

EXHIBIT 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Veritec, Inc. (the "Company") on Form 10-KSB for the period ended June 30, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Van Thuy Tran, Chief Executive Officer and I, Gerald Fors, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

- The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and
- The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of June 30, 2006 (the last date of the period covered by this Report).

/s/ Van Thuy Tran

---

Van Thuy Tran, Chief Executive Officer
Date: November 14, 2006

/s/ Gerald Fors

---

Gerald Fors, Chief Financial Officer
Date: November 14, 2006